IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CHRISTOPHER DUPREE,

      Petitioner,                    No. CIV S-02-1160 FCD GGH P

    vs.

ERNEST ROE, Warden, et al.,

      Respondents.                FINDINGS AND RECOMMENDATIONS

_____/

*Introduction and Summary*

        The introduction to this case was best put by Justice Raye in his opinion on direct review:

> The culture in which this murder occurred is cultivated by methamphetamine, populated by flakes and thugs, and sustained by pride and primal instinct for survival.  To suggest, as the Attorney General does, that defendant Larry Freeman was the mastermind of a five-man conspiracy to burgle, rob, and assault is to distort the meaning of mastermind and to imply a sense of organization and purpose foreign to the defendants' lifestyle.  The jury, in fact, heard a bizarre but typical tale of gangsters, armed with a small arsenal and high on methamphetamine, breaking into an apartment in the middle of the night to retaliate for alleged threats made to Freeman's mother and to steal a safe Freeman had stolen once before.

Opinion, California Court of Appeal, Exhibit E to Respondent's previously filed Motion to

1

Dismiss at 1.

Petitioner raises the following issues in his Third Amended Petition filed after exhaustion on February 17, 2005:

1. Whether due process, right to have the jury instructed on a defendant's theory of the case, was violated by the instruction of the court related to "claim of right" in connection with the robbery/burglary underlying the murder in this case;

2. Whether due process was violated by the trial court's not instructing on the temporal requirements in California law for felony robbery/burglary murder;

3. Whether there was insufficient evidence for a finding of special circumstances with respect to first degree felony murder;

4. Whether petitioner's counsel was deficient in his representation because:

   a. he did not investigate and present an alibi witness;

   b. he did not inform the court or object to a sleeping juror after petitioner notified him of this "fact."

After thorough review herein, the undersigned concludes that the petition should be denied.

*Facts*

The court has found the statement of facts contained in the opinion of the California Court of Appeal to be accurate and informative to the issues herein. Those facts are quoted below.

> One of the intruders, defendant Christopher Dupree, [petitioner herein] shot and killed the wrong man. The jury convicted Freeman and Dupree of first degree murder with special circumstances, attempted robbery, and burglary with various enhancements. They were both sentenced to life in prison without the possibility of parole. Two of the intruders, Stacen Rhine and Shaun Shorter, pleaded guilty to voluntary manslaughter and testified for the prosecution. The fifth assailant, Jiles Wallace, was separately tried and convicted.
>
> ............................................................................................

The essence of the defense was an attack on the credibility of the prosecution's witnesses, all of whom were friends and family of the five intruders. The jury became well acquainted with the flaws and foibles of this motley cast of characters and the twisted relationships that developed in a milieu permeated with drugs and guns. We begin with a loose description of three families and the odd, but fluid, relationships among them. [FN. These relationships make clarity difficult. We have chosen to refer to the five intruders by their last names since their involvement is integral to the entire case. On occasion, we refer to witnesses with the same last names by their first names in an attempt to achieve some clarity. We mean no disrespect to those witnesses.]

Cassandra "Sam" Rhine is at the center of the first family. At the time of the murder, she lived with defendant Freeman and her two daughters in the Coloma House Apartments in Rancho Cordova; defendant Dupree stayed with them periodically and was doing so at that time. The apartments were within the geographic territory claimed by the East Side PIRU street gang. Ann Goble, Sam's mother, first introduced her to methamphetamine when Sam was 22 years old. Since then, Sam, her mother, and her stepfather, Steven Goble, enjoyed time together either sniffing or injecting methamphetamine, although Sam was loathe to watch her stepfather actually insert the needle. She sniffed a line of methamphetamine before testifying at trial.

Apparently Sam's sense of survival surpassed her sense of loyalty. Before the murder, she enlisted Stacen Rhine to burglarize her stepfather's house. Once Freeman was arrested, she began dating Rhine and married him in the county jail a few months later. Rhine, an accomplished burglar and father of three, had been released from jail just a few days before the murder. After the murder, but before his arrest, Rhine had Thanksgiving dinner with the victim's family. As one of the five intruders, Rhine entered a plea agreement and testified at trial for the prosecution.

The second family consisted of Kowana Lewis; her brother, Scott Lewis; her boyfriend, Billy Stack; and her infant daughter. Although Stack was the intended target, Scott Lewis was shot and killed. Kowana, also a long time drug user, had been convicted of possession of a controlled substance for sale. Stack, another convicted felon, used about one-eighth of a gram of methamphetamine twice a week at the time of the murder. Although he had been shot in the leg by a friend of Freeman's at Freeman's urging, he could not remember which leg had been shot when he later testified.

The third household included Tamara Parker; her son; and one of the intruders, Jiles Wallace. The fifth intruder was Shaun Shorter, Tamara's brother. He was visiting his sister on November 15. Wallace, her boyfriend, was an "original gangster" of the East Side

PIRU and Shorter, her 17-year-old brother, was a "wannabe." Shorter, like Rhine, entered a plea agreement and testified for the prosecution. Wallace stored a small arsenal of weapons in their apartment, so Freeman enlisted Wallace's help on the night of the shooting. Wallace provided both manpower and firepower.

In summary, nearly every one of the percipient witnesses had used methamphetamine and/or other drugs and alcohol for many years preceding the murder; most were high either shortly before, during, or after the shooting; and many had sniffed or injected methamphetamine during the trial. To borrow a concept from tort law, the prosecutor was compelled to take his witnesses as they were, not as he might have liked them to be. The jury became well acquainted with their shortcomings. Nevertheless, these are the witnesses who provide an account of the events surrounding the shooting of Scott Lewis.

On November 11, Kowana and Stack returned to their apartment to find Scott entertaining Freeman, Dupree, and Kowana's niece. The visitors left shortly. Freeman returned in a few minutes, however, upset that someone had stolen his car stereo. He accused Stack of the theft. A verbal fight ensued, until Kowana chased Freeman out of the apartment with a stick. Around 4:00 a.m., Freeman returned with an associate. As Stack approached, the associate asked Freeman, "Is he the one?" Receiving an affirmative response, he shot Stack in the leg. Stack was treated at a local hospital and, during an investigative interview, identified "Larry" as one of the assailants.

On November 15, Freeman learned that Stack had threatened his mother and he asked Dupree and Rhine to back him up when he confronted Stack. They agreed. At approximately 8:00 p.m., the trio went to Tamara's apartment to obtain Wallace's assistance. Since he was not home, Freeman paged him and they waited for Wallace to return. Walking in, Wallace said to Freeman: "Man, you – you a punk. You a punk. [¶] . . . [¶] . . . Man, what you need me for? . . . What you need me for? [¶] . . . [¶] Y'all can go by yourself. [¶] . . . [¶] . . . I don't want to go." He went into a bedroom with Freeman while Dupree and Rhine went into a bathroom and ingested methamphetamine. Dupree appeared agitated and hyper.

They all talked about Freeman's mother being threatened and the need to "beat up" Stack. Wallace brought out a variety of handguns, and the men, full of bravado, bragged about taking care of Stack. Freeman, who had a .38 caliber pistol tucked in the waistband of his pants, talked "about maybe putting another one in [Stack's] other leg." According to Rhine, if the men came as a "backup," Freeman said "there was a safe there that was his that we could have." Freeman told them the safe had come from a storage unit Kowana and Stack had "rip[ped]-off" and he "got the safe" for

4

his help and the use of his car. Shorter testified: "[W]e was all talking about if there was a safe, we was going to get it." The trio left to get another car.

They arrived at the Gobles' house around 10 p.m. Goble agreed, as he often did, to loan Freeman his Datsun 240-Z. They each drank a quart of beer. Freeman gave his .38 chrome revolver to Dupree. The trio then returned to Tamara's apartment to pick up Wallace and Shorter.

Freeman did not want to drive his Volvo to Stack's apartment, so he borrowed a second car from a friend. They drove to Kowana and Stack's apartment, unaware that Stack was not home.

The five men discussed at some length who would carry which gun. Freeman dissuaded Dupree, who was carrying the .38, from taking a "bigger gun." He told Dupree, "You don't need no big gun. You will do something stupid with it." Shorter took the .357 handgun from Rhine, who was left unarmed. Wallace took the .44 and .45.

As the other four climbed the stairs to the apartment, Freeman remained at the bottom. He told Rhine, "Don't trip. Chris was going to handle it." Rhine, who was the first one up the stairs, feigned knocking at the door. [FN. There was conflict in the evidence as to whether or not Rhine knocked on the door.] They burst in.

Scott was lying on the couch. Startled, he began to get up and said, "Oh my God." Rhine, considering Scott a friend, responded, "What's up Scott?" He told the others, "That's Scott." He and Wallace rushed into Kowana's room looking for Stack and the safe. Wallace shouted, "Where's the safe, Bitch?" They looked through her closet but found no safe.

Meanwhile, Shorter yelled at Scott to get down. He complied, but Dupree, who was standing behind Shorter, opened fire. He shot Scott three times in the chest and shoulder. All five men then ran from the apartment empty-handed. Kowana was hysterical.

Two neighbors heard the commotion and were able to identify the 240-Z. Both described the second car as a Honda Civic.

Freeman was visibly angry when told that Scott had been shot. He pushed Dupree and yelled that he had shot the "wrong dude" and it was "all going to come back on him." Shorter rode with Dupree in the 240-Z. Dupree bragged, "That's the way you do it in . . . New Orleans." He told Shorter, "'[E]m guys they was talking all that shit, and that you see the only person who did something." He later told Rhine, "That's what you get for fucking with family."

```
           Freeman, Dupree, and Rhine returned the cars.  The following day,
           Freeman hid two guns at the Gobles'.
```

Court of Appeal Opinion at 2-8.

*Legal Standards*

The AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential standards of review to be used by a federal habeas court in assessing a state court's adjudication of a criminal defendant's claims of constitutional error. Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme Court defined the operative review standard set forth in § 2254(d). Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court. There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law. Id. at 1519. "Contrary to" clearly established law applies to two situations: (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law, or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is, the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue. Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000). It is this prong of the AEDPA standard of review which directs deference to be paid to state court decisions. While the deference is not blindly automatic, "the most important point is that an *unreasonable* application of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S. Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An unreasonable error is one in excess of even a reviewing court's perception that "clear error" has occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76 , 123 S. Ct. 1166, 1175 (2003).  Moreover, the established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts.  Early v. Packer, 537 U.S. at 10, 123 S. Ct. at 366.

However, where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue.  "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

A bit more will be stated about AEDPA review in appropriate sections.  Also, the standards for evidentiary hearing will be set forth below in the sections about the "alibi witness" and the "sleeping juror."

*Discussion*

A. Whether Due Process, Right to Have the Jury Instructed on a Defendant's Theory of the Case, Was Violated by the Instruction of the Court Related to "Claim of Right" in Connection with the Robbery/Burglary Underlying the Murder in this Case

Petitioner's jury was instructed:

> Now I concluded yesterday in defining for you the crimes of burglary and robbery and attempt principles.
>
> Now, relating to those charges, it is a principle of law that the intent to commit robbery or burglary is lacking when the taker, the person taking or attempting to take property, entertains a good faith belief that he has the right to the property taken, even if the belief is mistaken.
>
> An exception to the general rule applies, however, when the purported right is based on an illegal endeavor. In the latter case, felonious intent is not negated or eliminated.
>
> As a matter of law, one cannot have a good faith belief that he has a right to property when that right is rooted in an illegal transaction.

RT 2624.

Petitioner is a bit unsure about his theory. The headlined theory is that the court's last sentence in the instruction deprived petitioner of the "right to present a defense" through jury instructions, see <u>Solis v. Garcia</u>, 219 F.3d 922, 929 (9th Cir. 2000); <u>Bashor v. Risely</u>, 770 F.2d 1228, 1240 (9th Cir. 1984). Petitioner repeats that theme in the first sentence of the second paragraph at page 6 of the Third Amended Petition. However, petitioner also relates that the last sentence of the instruction also violated his right that "the jury be instructed correctly as to every essential element of the offense..." (A <u>Winship</u> [397 U.S. 358, 90 S. Ct. 1068 (1970) theory.)

If petitioner means to suggest that he simply disagrees with the law, i.e., that one has a right of self-help under California law, and that if burglary or robbery occur in the course of that self-help, such conduct is immunized, he has come to the wrong court for an announcement of this novel proposition of state law. <u>See</u> Court of Appeal Opinion at 21-23.

The more probable interpretation of the claim is that petitioner believes the instruction created a type of irrebuttable presumption to the effect that if the jury found an illegal transaction at the core of the events, petitioner would have to be found guilty of robbery. If the jury instruction could be logically so interpreted, petitioner would have a point.

\\\\\

1 However, as the Court of Appeal found, such an interpretation is at odds with the individual instruction at issue and with the instructions as a whole. The jury was instructed that the prosecution had the burden to prove its case, i.e., the elements of its case, beyond a reasonable doubt. CT 392, 421, 422. The elements of burglary and robbery were spelled out for the jury. CT 445, 447, 448, 449. The instruction at issue no more than spelled out an exception to the robbery and burglary instructions (favorable to petitioner) and then spelled out an exception to the exception. There is no language in the instruction requiring the jury to find that petitioner had the mental state necessary for robbery and burglary simply because the robbery exception of "claim of right" would be negated as a matter of law "when that right is rooted in an illegal transaction."[1] Although not a difficult task under the facts of the case, the jury still had to find the required mental states for burglary and robbery. Another way of putting it is that due process is not violated simply because the facts ineluctably lead to only one conclusion when a neutrally worded jury instruction (s) is applied.

The claim should be denied.

B. Whether Due Process Was Violated by the Trial Court's Not Instructing on the Temporal Requirements in California Law for Felony Robbery/Burglary Murder

Again, petitioner raises the "right to an instruction which presents the defense" as his headlined claim, but then digresses into the "real claim" – a Winship claim which faulted the trial court for failure to give instructions which required the prosecution to prove every element of the offense beyond a reasonable doubt. See Reply at 2 citing Winship. Petitioner singles out the asserted lack of an instruction defining the temporal requirements associated with the special

---

[1] The illegal transactions here were the very *burglary* for the purpose of *wreaking physical retaliation* on a person in the perpetrators' disfavor, *burglary* for the purpose of taking back the safe, and intending to take back the property *at the point of a gun*, if necessary, and which actually occurred. All of these italicized events were very illegal. This is not the case where the defendants knocked politely and quietly asked that the safe be returned. This is not even the case where the defendants were otherwise legitimately at a residence, and during the course of an argument, they then simply determined to walk off with the safe.

circumstance of felony robbery/burglary murder.  Perhaps petitioner takes this tack because he does not mention whether he asked for a specific instruction which was refused in the court below, and is concerned about waiver.

Petitioner's claim that he was not able to present his case to the jury because of the lack of a sua sponte instruction is a legal oxymoron.  That is, how can petitioner assert he was not able to present his case through an instruction, if he never asked that the instruction be given?  Obviously, petitioner was not prevented from doing anything with respect to his "defense" or "theory of the case."

The temporal requirements involved in special circumstance felony robbery/burglary murder are not defenses, but are California law to which the prosecution must comply.   The real question is whether some other jury instruction regarding the temporal requirements aside from what was given was required, *sua sponte* (assuming that a federal claim is stated in the first instance).

The California Supreme Court in People v. Lewis, 25 Cal. 4th 610, 642, and 647, 106 Cal. Rptr. 2d 629, 655 and 659 (2001), reiterated the legal standards for felony robber/burglary murder:

> Liability for first degree murder based on a felony-murder theory is proper when the defendant kills in the commission of robbery, burglary, or any of the other felonies listed in section 189.  For conviction, the prosecution must establish that the defendant, either before or during the commission of the acts that caused the victim's death, had the specific intent to commit one of the listed felonies. (People v. Anderson (1968) 70 Cal.2d 15, 34, 73 Cal.Rptr. 550, 447 P.2d 942; People v. Proctor (1992) 4 Cal.4th 499, 532, 15 Cal.Rptr.2d 340, 842 P.2d 1100.) Thus, to find a defendant guilty of first degree murder based on a killing perpetrated during a robbery, the evidence must show the defendant intended to steal the victim's property either before or during the fatal assault. (§ 211; People v. Sakarias (2000) 22 Cal.4th 596, 619, 94 Cal.Rptr.2d 17, 995 P.2d 152; People v. Marshall, supra, 15 Cal.4th at p. 34, 61 Cal.Rptr.2d 84, 931 P.2d 262.) Conviction of felony murder in the commission of burglary requires proof that the defendant entered the residence with the intent to commit a felony or theft. (§ 459; People v. Frye (1998) 18 Cal.4th 894, 954, 77 Cal.Rptr.2d 25, 959 P.2d 183; People v.

1  Proctor, supra, at p. 533, 15 Cal.Rptr.2d 340, 842 P.2d 1100.)

2  ***

3  Conversely, when the killer forms the intent to commit an
   independent felony only after delivering the fatal blow to the
4  victim, the felony murder doctrine does not apply.

5  There is no significant difference between felony murder and the special circumstance of felony murder in the aspect of the timing of formation of intent. See People v. Tafoya, 42 Cal. 4th 147, 170-171, 64 Cal. Rptr. 3d 163, 187-188 (2007). In this case, the jury was instructed with CALJIC8.81.17 which requires that the murder was committed while defendant was "in the commission of" the robbery or burglary, and that the murder was committed to "carry out or advance" the robbery or burglary. CT 486. When the instruction is read as a whole, there can be no doubt that no felony murder could be found unless the intent to rob and/or burgle had been formed prior to the murder. Otherwise, the murder would not be "advancing" the robbery or burglary and would be incidental to an after-the-fact determination to commit the supposedly, underlying felony. Moreover, with respect to the underlying first degree felony murder, the jury was instructed that the perpetrator had to have the "specific intent to commit such crime" [the underlying felony]. Taken together, the jury was adequately instructed, and the prosecutor was not relieved of any of his burden.

C. Whether There Was Insufficient Evidence for a Finding of Special Circumstances with Respect to First Degree Felony Murder

First, the burden on petitioner to demonstrate insufficiency of the evidence is extraordinary in an AEDPA case. When a challenge is brought alleging insufficient evidence, federal habeas corpus relief is available if it is found that upon the record evidence adduced at trial, viewed in the light most favorable to the prosecution, no rational trier of fact could have found "the essential elements of the crime" proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Under Jackson, the court reviews the entire record when the sufficiency of the evidence is challenged on habeas. Adamson v. Ricketts,

1  758 F.2d 441, 448, n. 11 (9th Cir. 1985), vacated on other grounds, 789 F.2d 722 (9th Cir. 1986)
2  (en banc), rev'd, 483 U.S. 1 (1987).  It is the province of the jury to "resolve conflicts in the
3  testimony, to weigh the evidence, and to draw reasonable inferences from basic facts." Jackson,
4  443 U.S. at 319, 99 S. Ct. at 2789.  "The question is not whether we are personally convinced
5  beyond a reasonable doubt.  It is whether rational jurors could have reached the same conclusion
6  that these jurors reached." Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991).

       If the trier of fact could draw conflicting inferences from the evidence, the court in its review will assign the inference that favors conviction. McMillan v. Gomez, 19 F.3d 465, 469 (9th Cir. 1994).  The fact that petitioner can construct from the evidence alternative scenarios at odds with the verdict does not mean that the evidence was insufficient, i.e., that no reasonable trier of fact could have found the conviction scenario beyond a reasonable doubt.

> In reviewing the sufficiency of the evidence supporting a conviction, we search the record to determine "whether a reasonable jury, after viewing the evidence in the light most favorable to the government, could have found the defendants guilty beyond a reasonable doubt of each essential element of the crime charged." United States v. Douglass, 780 F.2d 1472, 1476 (9th Cir.1986). *The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the jury could reasonably arrive at its verdict.* United States v. Fleishman, 684 F.2d 1329, 1340 (9th Cir.), cert. denied, 459 U.S. 1044, 103 S. Ct. 464, 74 L. Ed.2d 614 (1982); United States v. Federico, 658 F.2d 1337, 1343 (9th Cir.1981), overruled on other grounds, United States v. De Bright, 730 F.2d 1255, 1259 (9th Cir.1984) (en banc).

United States v. Mares, 940 F.2d 455, 458 (9th Cir. 1991) (emphasis added).

       Superimposed on these already stringent insufficiency standards is the AEDPA requirement that even if a federal court were to initially find on its own that no reasonable jury should have arrived at its conclusion, the federal court must also determine that the state appellate court could not have affirmed the verdict under the Jackson standard in the absence of an unreasonable determination. Juan H. v. Allen, 408 F.3d 1262 (9th Cir. 2005).

       In speaking about the lack of duty under California law to instruct *sua sponte* on the temporal requirements for felony murder, the Court of Appeal, in explaining why no evidence

existed to support an after-the-murder-intent scenario, also demonstrated why the evidence was sufficient for petitioner's conviction:

> Dupree points out he shot Lewis soon after he and his accomplices entered the apartment. From the timing of his shooting, he hypothecates that Rhine and Wallace thereafter decided to search for, and take, the safe. The record defies Dupree's make-believe tale.
>
> There is absolutely no evidence that any of the coconspirators or accomplices formulated the intent to take the safe after the shooting. The evidence is to the contrary. Rhine and Shorter testified Freeman had promised the group the safe and its contents as a payoff for their backup assistance. The deal was struck before they entered the apartment. Their testimony was corroborated by the assailants' behavior immediately upon entering the apartment. Rhine and Wallace went directly to Kowana's room and Wallace shouted at her, "Where's the safe, Bitch?" They immediately began to rummage through her room in search of the safe. Hence, they were already in the back of the house executing their plan to steal the safe when they heard the fatal shots.

Court of Appeal Opinion at 25.

The Court of Appeal also explained at length that even though the planned assault on Stack could not qualify as an underlying felony for the murder, as far as felony murder was concerned,[2] the fact that there may have been dual motives for the robbery/burglary, i.e., taking the safe and assault of Stack, was inconsequential. Court of Appeal Opinion at 27. As long as the desire to forcibly take the safe was a substantial motivator, sufficient evidence existed for felony murder.

Petitioner does not take issue with the fact exposition from the record of the Court of Appeal; he merely (unreasonably) takes issue with the inferences drawn from the facts. To the

---

[2] The Court of Appeal may have been too lenient in this respect. Although it is clear that if the planned assault victim, Stack, had been killed, such planned assault could not qualify as the underlying felony for purposes of felony murder, it is not so clear that the planned assault, certainly sufficient to allow a burglary conviction per se, could not be a proper underlying felony for felony murder purposes, when an unintended victim was shot during the course of the burglary. However, because it is so clear that the attempted robbery could qualify as an underlying felony, there is no need to analyze this issue further.

extent petitioner argues that felony murder cannot stand when the murder of the bystander victim was unintended, or even accidental, such a contention is meritless under California law. CALJIC 8.21, CT 459 (felony murder includes those killings which are intentional, unintended, or accidental, as long as the killing is done with the pre-killing intent to rob or burgle.) And, petitioner's position in the state court that the killing of Scott did not "advance" the purpose of the robbery or burglary is meritless. The jury could certainly infer that killing a person who could potentially interfere with the theft crime, be a later witness to its occurrence, or return later for revenge, was a killing that advanced the purpose of the robbery/burglary. According to petitioner – that's the way you do it in New Orleans. Petitioner's remaining contention that he did not share in the intent to rob or burgle because he thought the safe belonged to Freeman, has previously been rejected. This claim should be denied.

     D.  <u>Whether Petitioner's Counsel Was Deficient in His Representation Because:</u>

     <u>a. He Did Not Investigate and Present an Alibi Witness;</u>

     <u>b. He Did Not Inform the Court or Object to a Sleeping Juror after Petitioner Notified Him of this "Fact"</u>

         Petitioner cannot prevail on these contentions because for issue (a), petitioner had a fair, evidentiary hearing on his motion for new trial raising this claim, and he presents nothing here in the way of extra evidence to "clearly and convincingly" show error in the trial court's decision. The claim about a sleeping juror (b) does not warrant an evidentiary hearing as the operative petition is devoid of any specific facts regarding this sleeping juror, and in any event, petitioner is not entitled to an evidentiary hearing because he did not timely ask for one in the state courts.

         As the record indicates, the trial court undertook a lengthy post-trial process and evidentiary hearing to review petitioner's contention that his lawyer failed to present alibi witnesses who would show that he was not even present at the murder scene. The alibi witnesses testified. The trial court found that the alibi witnesses lacked credibility. Court of Appeal

Opinion at 42-43. The Court of Appeal examined the entire issue of the motion for new trial on appeal for both Freeman and petitioner. Court of Appeal Opinion at 39-45.

There is no need to detail the findings of the trial and appellate courts. Without regard to 28 U.S.C. § 2254(e)(1), petitioner simply requests a do-over. That is, § 2254(e)(1) provides that factual determinations made by the state courts are "presumed correct," and cannot be overturned without a "clear and convincing" showing. Petitioner does not request to add any evidence that was not heard; he certainly provides none to the court, nor does he allude to any. Petitioner is entitled to an evidentiary hearing for diligently presented colorable claims *if he has not had a fair and complete hearing on the issue in state court*. Alberni v. McDaniel, 458 F.3d 860, 873 (9th Cir. 2006). Petitioner had such a full and complete hearing, and does not assert that it was otherwise. He is simply not permitted to have this court re-hear the same evidence in the hope that a federal court might come to a de novo different conclusion.

Petitioner also takes an alternative tack in his argument. He argues that his case as presented was so weak that "even a shaky" alibi witness would have been helpful.[3] Third Amended Petition at 9. Such an argument does not present a colorable ineffective assistance claim. Petitioner must show that had counsel presented the alibi witness(es), their testimony would have probably changed the outcome, i.e., undermined confidence in the outcome. Strickland v. Washington, 466 U.S. 668, 694, 104 S. Ct. 2052 (1984). Petitioner's desperate assertion that – anything would have made the defense look better – is inadequate from a prejudice standpoint.

The sleeping juror claim is precluded from evidentiary hearing, but for different reasons. Petitioner alleges that he informed his counsel at trial that a juror was sleeping, but counsel did nothing about it. This is the sum total of factual allegation regarding the sleeping

---

[3] On the motion for new trial, petitioner's counsel argued: "As it was...I have never stood in front of a jury with less to argue. Despite our best efforts to seek Mr. Ray– we could not call Mr. Dupree to the stand because of my tactical decision and one he agreed with, we essentially had no defense."

15

juror before the court in any petition which has been filed. The juror is not identified in any fashion, nor is the length of time the juror was sleeping mentioned. Despite having a motion for new trial evidentiary hearing on the alibi witness, petitioner "forgot" to bring up the sleepy juror assertion. Nothing was mentioned on direct review. It was not until an amended habeas petition was filed in *federal court* on April 7, 2003 that a claim about a sleeping juror was made. The claim was exhausted in the state supreme court and refiled in the Third Amended Petition. Thus, petitioner is not entitled to an evidentiary hearing because the bare bones assertion of an unidentified (in any way) sleeping juror lacks specificity. Moreover, it is not diligently made for evidentiary hearing purposes.

Petitioner does not get an evidentiary hearing simply because he asks for one. The claim subject to the request must be specifically made before a hearing should be ordered. "Nevertheless, the district court did not abuse its discretion in denying the [evidentiary] hearing because Gaines has not satisfied the 'threshold matter' of 'stat[ing] with particularity facts which, if proven, would entitle him to relief.'" Baja v. Ducharme, 187 F.3d 1075, 1079 (9th Cir.1999) (citation and internal quotation marks omitted).' Gaines v. Miller-Stout, 220 Fed. Appx. 737 (9th Cir. 2007).[4] The same result should obtain here. The undersigned is not embellishing the lack of specific factual assertion to state that the Third Amended Petition (as well as the initial Amended Petition) relates nothing of substance about the claim, e.g., some form of identity, length of time of alleged sleeping, what was transpiring in court at the time, time when the attorney was told, etc. The claim does not warrant an evidentiary hearing.

Also, petitioner did not diligently seek a hearing in state court on these facts. He had the opportunity to raise the issue at the motion for new trial – he did not. He had the opportunity to raise it in initial state habeas proceedings – he did not. He had the opportunity to even raise it in his initial federal petition – he did not. And, all along, petitioner had, by his own

---

[4] Unpublished Ninth Circuit cases may now be cited if the case was issued subsequent to January 1, 2007.

admission, knowledge of the pertinent facts. The very belated statement of this claim and attempt at exhaustion does not demonstrate the required diligence.

Williams v. Taylor, 529 U.S. 420, 437, 120 S. Ct. 1479, 1491 (2000) provides the authoritative statement on the need for diligence when the facts are first known: "If there has been no lack of diligence *at the relevant stages* in the state proceedings, the prisoner has not 'failed to develop' the facts under § 2254(e)(2)'s opening clause, and he will be excused from compliance with the balance of the subsection's requirements." (Emphasis added). One claim found lacking diligence in its presentation in Williams under the above standard was a Brady claim which should have been apparent to state habeas counsel prior to the first rendition of the claim in federal court. The situation here precisely duplicates that of Williams, and is controlled by that case. With knowledge of the alleged facts (sparse as they are to this day), petitioner failed to raise the claim in any post-trial motion or in any state proceedings prior to its belated rendition here in federal court. This is the antithesis of diligence.

Thus, petitioner may not have an evidentiary hearing on the sleeping juror issue unless he meets the requirements set forth in § 2254(e)(2): the claim involves a new rule of constitutional law or a factual predicate which could not have been previously discovered, *and* the facts underlying the claim demonstrate actual innocence. None of those requirements have been met.

Because petitioner is not entitled to an evidentiary hearing, he cannot prove his sleeping juror claim. The claim must be denied.

*Conclusion*

Accordingly, IT IS HEREBY RECOMMENDED no claim in this petition should be granted, and the entire petition should be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written

17

1. objections with the court and serve a copy on all parties. Such a document should be captioned
2. "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections
3. shall be served and filed within ten days after service of the objections. The parties are advised
4. that failure to file objections within the specified time may waive the right to appeal the District
5. Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).
6. DATED: 12/17/07

/s/ Gregory G. Hollows

UNITED STATES MAGISTRATE JUDGE

GGH:gh:035
dupr1160.157